UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HELEN SENU-OKE,                    :    Case No. 3:11-cv-79
                                   :
        Plaintiff,                 :    Judge Timothy S. Black
                                   :
vs.                                :
                                   :
DAYTON PUBLIC SCHOOLS, *et al.*,   :
                                   :
        Defendants.                :

## ORDER THAT: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 16) IS GRANTED; AND (2) THIS CASE IS CLOSED

This civil action is before the Court on Defendants' motion for summary judgment

(Doc. 16) and the parties' responsive memoranda (Docs. 31, 32).[1]

## I.    BACKGROUND FACTS

This case arises out of an employment and civil rights complaint filed by Plaintiff

against the Defendants, Dayton Public Schools ("DPS")[2] and the Dayton Board of

Education.  Plaintiff claims that Defendants discriminated against her on the basis of her

race, gender, and age, and retaliated against her because she complained of

discrimination.[3]  Defendants have moved for summary judgment on all claims.

---

[1] Also pending before the Court is Defendants' motion to strike Plaintiff's errata sheets. (Doc. 28).  Subsequently, Plaintiff withdrew the errata sheets.  (Doc. 29).  Therefore, Defendants' motion to strike is hereby **DENIED** as **MOOT**.

[2] Plaintiff does not dispute the dismissal of DPS as a party to this action, as the Dayton Board of Education is the proper party in this case.  (*See* Doc. 31 at 1, fn 1).

[3] Plaintiff does not dispute the dismissal of her age discrimination claims.  (*See* Doc. 31 at 1, fn 1).

## II.    UNDISPUTED FACTS[4]

1.    Plaintiff Helen Senu-Oke, Ed.D. is an African American female who was hired as an Associate Director of Special Education by the Dayton Board of Education in 1996.  (Doc. 18 at 6).

2.    When Plaintiff was hired, her immediate supervisor was Elizabeth Hagton, Ph.D., a Caucasian female.  (Doc. 16, Ex. 1 at ¶ 8; Ex. B at 26-32).

3.    The following school year, Dr. Hagton retired, and she was replaced as Director of Special Education by Sylvia Orr, an African-American female.  (Doc. 16, Ex. A at ¶ 10).

4.    In 1999, the Board of Education appointed Kathy Condron, a Caucasian female, as "Co-Director of Special Education."  (*Id.* at ¶ 11).

5.    The Board did so at the request of Sylvia Orr.  (Doc. 16, Ex. D at 30-31).

6.    Plaintiff claims, however, that the co-directorship was specifically created as a "conspiracy" between the Board, Orr, and Janice West (an African American Assistant Superintendent) to place a Caucasian individual – Condron - into the Director position.  (Doc. 16, Ex. A at ¶ 11; Doc. 18 at 160).[5]

7.    In 2002, Plaintiff applied for the Director position, but the interviewing panel consistently felt she was not suited for the position.  (Doc. 16, Ex. D at 60; Ex. B at 39-49, 75; Ex. E at 12-15, 67, 78-86).[6]

---

[4]    *See* Doc. 16, Ex. 2 and Doc. 31, Ex. 2.

[5]    Plaintiff admits that she filed a race discrimination lawsuit in 2003, but notes that DPS relies on the impermissible inference that members of a group of individuals could not discriminate against members of the same group.  *Wexler v. Whites Fine Furniture*, 317 F.3d 564, 571-72 (6th Cir. 2003).

[6]    Plaintiff denies the facts in ¶¶ 7-9 insofar as multiple employees commended her for her diligence, knowledge, and skills.  (Doc. 31, Ex. A).  Moreover, despite these performance concerns, Plaintiff remained employed at DPS and received satisfactory performance evaluations until she complained to Stanic about the rehiring of Orr.  (Doc. 18, Ex. 10).

8.  Several of Plaintiff's former supervisors testified that, in addition to their concerns over tardiness, poor attitude, and a lack of creativity and initiative, Plaintiff simply did not show the same dedication to her job as did other Associate Directors. (Doc. 16, Ex. F at 59; Doc. 16, Ex. D at 93-96, 99-102; Ex. B at 39-49, 75; Ex. G at 55-56).

9.  These supervisors all noted that Plaintiff did not put forth the extra effort, that she had trouble getting along with staff, that her behavior was, on occasion, inappropriate, and that there had been direct communications from administrators in various schools who were concerned that Plaintiff would not be a good fit in the Director position. (Doc. 16, Ex. F at 71-72, 98; Doc. 16, Ex. D at 72; Ex. B at 53-72).

10. During the hiring process, the Board appointed George Schueremann, a Caucasian male and a curriculum specialist at the District's Roosevelt Center, to fill the Director of Special Education position on an interim basis. (Doc. 16, Ex. A at ¶ 29).

11. Assistant Superintendent West testified that it was important to appoint an interim director who was not interested in holding the position permanently and was not actively vying for the position. (Doc. 16, Ex. B at 110-111). Schueremann was not one of the candidates for the permanent position. (*Id*.)

12. The Board of Education appointed Cleaster Jackson, an African American female who held a doctorate in education, to the position of Director of Special Education in 2003. (Doc. 16, Ex. F at 41-45).[7]

13. Throughout her tenure and even today, Plaintiff has claimed to be the most credentialed and qualified person in the Special Education Department. (*Id*. at 53,104).[8]

14. On July 18, 2003, Plaintiff filed a complaint in the Montgomery County Court of Common Pleas against the Dayton Board of Education and against Janice West. (Doc. 16, Ex. A).

---

[7] Plaintiff admits this fact but notes that Jackson's appointment had not occurred at the time she filed her 2003 complaint. (Doc. 18, Ex. 2 at ¶ 33).

[8] Plaintiff notes that even Smith admitted that Plaintiff had the highest licensure approved by the Ohio Department of Education for the purpose of special education. (Doc. 27 at 64-65).

15.     Plaintiff claimed she was rejected for the Director of Special Education position because of her race and gender in violation of O.R.C. § 4112.02(A). (*Id*.) It was her contention that Jan West, an African American female, discriminated against Plaintiff because she is an African American female by selecting an African American female for the Director of Special Education position.[9]

16.     The Ohio trial court granted summary judgment to the Board of Education on February 15, 2005. (Doc. 16, Ex. H).

17.     That decision was affirmed by the Second District Court of Appeals. *Senu-Oke v. Bd. of Ed*., App. Case No. CA20967, 2005-Ohio-5239. However, the appellate court reversed the trial court's decision in favor of Janice West, which had been issued on the pleadings under Ohio Rule 12(c), on the basis that the matter was not ripe for a decision based on the pleadings alone. (*Id*. at ¶ 21).

18.     Thereafter, the trial court granted summary judgment to Janet West on May 31, 2007. (Doc. 16, Ex. I). An appeal of that decision was withdrawn on November 11, 2007. (*Id.*, Ex. J).

19.     In late 2007, Jennifer Smith, a Caucasian female, became the Director of Special Education. (Doc. 27 at 10).

20.     At least three different individuals held the Director position between George Schueremann (interim) and Jennifer Smith – Dr. Jackson (African American female); Kathy Donoff (Caucasian female); and Sylvia Orr (African American female). (Doc. 18 at 17).

21.     At the time of her appointment, Jennifer Smith had been with DPS for 18 years both as a Curriculum Specialist and as a special education teacher. (Doc. 27 at 6-7).

22.     Jennifer Smith was not involved in the 2003 lawsuit. (Doc. 18 at 16, 27). She was not named as a witness or deposed by either party in that case. (*Id*. at 16).

---

[9] Plaintiff denies these facts insofar as Jackson's appointment had not occurred at the time Plaintiff filed her 2003 Complaint and Plaintiff also complained about the appointments of others outside her protected classes. (Doc. 18, Ex. 2).

23.    The Board of Education had kept the litigation confidential.  (Doc. 27 at 10).[10]

24.    Several DPS personnel involved in the prior lawsuit had resigned from DPS by the time of the facts in the current case:  Rebecca Lowry replaced Jan West; Dr. Kurt Stanic replaced Percy Mack as Superintendent for the 2008-2009 school year; Dr. Jackson had resigned; and Sylvia Orr had retired.  (Doc. 18, Ex. 20).

25.    Dr. Kurt Stanic became the Superintendent for DPS in the 2008-2009 school year.  (Doc. 16, Ex. K at ¶ 15).

26.    Stanic had no direct supervisory role over Plaintiff.  (Doc. 25 at 8).[11]

27.    He also had no involvement in the prior lawsuit between Plaintiff and DPS.  (Doc. 18 at 26-27).

28.    Early in Dr. Stanic's tenure as DPS Superintendent, Plaintiff requested a meeting to discuss her belief that she was not being paid enough.  (Doc. 25 at 17).[12]

29.    DPS has an equal employment compliance officer.  (Doc. 19 at 294).

30.    Plaintiff was aware of that fact because she had previously taken her pay disparity complaints to that individual.  (*Id*.; Doc. 16, Ex. A).

31.    DPS also has an entire Human Resources Department.  (Doc. 18 at 295).

32.    Rather than following DPS policy and taking her complaints to the compliance officer or HR, Plaintiff believed it was her prerogative to go

---

[10]  Plaintiff denies this fact insofar as the lawsuit was not filed under seal and Smith admits that she learned about the suit in 2007.  (Doc. 27 at 10-11; Doc. 18, Ex. 2).

[11]  Plaintiff denies this fact insofar as Stanic had the authority to recommend her termination to the Board.  (Doc. 21 at 14, 52).

[12]  With respect to ¶¶ 28-30, Plaintiff admits that she complained several times to Stanic about discriminatory pay.  (Doc. 19 at 251-254, 259, 261, 296).

straight to the Superintendent with her complaints. (*Id*. at 295-296).[13]

37.    Smith testified that she was aware that Plaintiff may have requested a meeting with the superintendent, but she never learned the subject or substance of that meeting. (*Id*. at 12).

38.    Plaintiff does not have any evidence that Smith was aware of any of Plaintiff's complaints to Dr. Stanic. (Doc. 19 at 301).

39.    Plaintiff's termination from DPS was supported with a Notice of Charges and Specifications listing twelve instances of misconduct, with one instance being the final catalyst. (Doc. 18, Ex. 13).[14]

40.    In September 2008, Plaintiff sought reimbursement for mileage for round trips between school district buildings, when she was not actually completing a round trip. (Doc. 27 at 170-172).[15]

41.    Plaintiff did not deny this; instead, she complained to Smith that others had done the same thing. (Doc. 18, Ex. 13 at DPS-0769, Doc. 27 at 171).[16]

42.    Smith asked her to reassess and resubmit the mileage request. (Doc. 18, Ex. 13 at DPS-0769).[17]

---

[13] Plaintiff admits that she complained to Stanic multiple times but she disputes the implication that her complaints were inappropriate.

[14] Plaintiff admits that she received a Notice of Charges, but denies this fact insofar as she asserts that she has established a question as to whether there was pretext for discrimination or retaliation. (Doc. 31 at 23, 25-29).

[15] Plaintiff denies these facts insofar as she completed her mileage forms according to DPS policy. (Doc. 18 at 76-78; Ex. 19).

[16] Plaintiff admits these facts and notes that complaints about perceived disparate treatment is protected activity. *Patrick v. Ferguson Enterpr., Inc*., No. 1:10cv45, 2011 U.S. Dist. LEXIS 10418, at *13 (S.D. Ohio Feb. 2, 2011).

[17] Plaintiff admits that Smith made a request but that Plaintiff completed her mileage forms according to DPS policy. (Doc. 18 at 76-78; Ex. 19).

43.     The reason this issue was important was that the finance office was complaining about managing mileage costs, which prompted individuals in her position to monitor these costs more closely. (Doc. 23 at 25).

44.     Plaintiff admits that she refused Jennifer Smith's instructions to review and make corrections to the mileage form. (Doc. 18 at 77).[18]

45.     In light of this e-mail conversation and the failure of Plaintiff to revise her form, Jennifer Smith asked Plaintiff for an affirmative and written response stating that she understands Board policy on this issue. (Doc. 18, Ex. 19).

46.     Plaintiff, however, did not send any written response to her supervisor, even when Smith asked her to do so more than once. (*Id*.; Doc. 27 at 176).

47.     On February 6, 2009, Dr. Lowry and Jennifer Smith met with Plaintiff to discuss an email that she had sent complaining about Sylvia Orr being rehired. (Doc. 18, Ex. 31A; Ex. 23; Doc. 23 at 20).[19]

49.     At the end of the meeting, Jennifer Smith again brought up the mileage question. (*Id*.) She presented a letter to Plaintiff explaining what the district policy on mileage was. (*Id*.) Jennifer Smith again asked for her to acknowledge in writing that she understood the District's policy on mileage. (*Id*.) Instead of doing so, Plaintiff simply walked out of a meeting stating, "I do not have to sit and listen to this." (Doc. 27 at 179, 187).[20]

50.     Plaintiff received a First Written Reminder about the direct deposit policy, about the mileage policy, and insubordination. (*Id*.)[21]

---

[18] Plaintiff denies facts 44-46 insofar as she believed resubmitting her forms and/or submitting a statement would be a false admission that they did not accord with DPS policy. (Doc. 18 at 85).

[19] Plaintiff admits to meeting, but not that Lowry and Smith called the meeting because she copied Stanic on the Complaint about a possible hostile environment. (Doc. 18, Exs. 21, 22).

[20] Plaintiff denies these facts insofar as she believed resubmitting her forms and/or submitting a statement would be a false admission that they did not accord with DPS policy. (Doc. 18 at 85). Moreover, Plaintiff disputes that she refused to take the letter or made this statement to Smith. (*Id.* at 115-116, 148).

[21] Plaintiff admits that she received a written reprimand, but denies the contents of it insofar as others violated direct deposit policy, DPS lost no money over the mileage dispute, and Smith approved her subsequent mileage request. Plaintiff denies any insubordination. (Doc. 21 at 38; Doc. 27 at 172, 174, 176, 178; Doc. 18 at 148).

56. Plaintiff only provided two documents to support her evaluation. One was a list of her job functions (Doc. 18, Ex. 33), which was identical to a list she had prepared and submitted to Sylvia Orr in 2005. (*Id.*, Ex. 35). The second was a statement that, "If there is anybody in our department who has done provable professional development required by the Ohio Department of Education at a major research university, I am willing to compare whatever they have done with what I have done." (*Id.*, Ex. 34).[22]

57. Jennifer Smith gave Plaintiff another chance at the time of the April evaluation, when she again instructed her to put together the requested documentation by the time of the year-end evaluation, which would take place in June. (Doc. 18, Ex. 36).[23]

58. In June, Smith sent Plaintiff a reminder. (*Id.*, Ex. 70).[24]

59. Plaintiff admits that she never provided the evaluation documentation that her supervisor had requested. (*Id.* at 178).

60. Plaintiff also refused to sign evaluation documents. (Doc. 27 at 77, and Ex. 41, setting forth Smith's contemporaneous explanation of the situation).

62. When Plaintiff failed to present any evidence to support her end of year evaluation, she was told that district policy required her to be placed on a performance improvement plan for the new school year. (Doc. 27 at 190).[25]

63. On July 21, 2009, Plaintiff submitted a request to use earned vacation time for the days of August 5 through August 11, 2009, via the school's electronic system. (Doc. 18 at 36, Ex. 9). The reason she gave was "to conduct dissertation research." (*Id.*)

---

[22] Plaintiff admits that she submitted Exs. 33 and 34; but denies that Smith informed her that the document was unacceptable. (Doc. 18 at 138, 143, 165-66).

[23] Plaintiff denies this fact insofar as the document does not bear her signature and she does not recall seeing the document or discussing it. (Doc. 18 at 157-160, 163-164).

[24] Plaintiff denies this fact insofar as Smith's email refers only vaguely to any follow-up documentation required. (Doc. 18, Ex. 70).

[25] Plaintiff admits that Smith told her she would be on a PIP, but denies that this was the reason for it. (Doc. 31 at 23, 25-29).

64.    Plaintiff had purchased non-refundable airline tickets on July 20, 2009. (*Id.*, Ex. 43).

65.    Upon receiving the vacation request, Smith went to her supervisor Jane Rafal because she realized it was outside the window for administrators to take vacations.  (Doc. 27 at 39).[26]

66.    Unlike teachers, DPS administrators do not get the summers off.  (Doc. 18 at 438-439).

67.    Early in 2009, the Special Education Department administrators were given the academic calendar for the 2009-2010 school year along with recommended vacation dates.  (Doc. 27 at 13).[27]

68.    It was also well known in the District that the weeks leading up to the beginning of the school year were critical.  (Doc. 27 at 38; Doc. 21 at 22).

69.    No Special Education Department employee had ever asked Jennifer Smith to take vacation in the weeks leading up to the beginning of a new school year.  (Doc. 27 at 62).

70.    The weeks leading up to the 2009-2010 school year were particularly important for the Special Education Department.  (Doc. 27 at 42).[28]

71.    There was mandatory computer training scheduled for August 7, 2009, which was critical to the functioning of the department.  (*Id.* at 15; Doc. 18, Ex. 42).

72.    All Special Education Department Staff, including the Director, the Associate Directors and the Curriculum Specialists were required to attend. (Doc. 27 at 15).

---

[26]  Plaintiff denies this fact insofar as a jury could conclude Smith had a different motive for raising the issue with Rafal.

[27]  Plaintiff claims that facts 67-69 are irrelevant insofar as she did not know until July 2009, just before she requested leave, that she would have the unexpected opportunity to conduct her doctoral research.  (Doc. 19 at 167).

[28]  Plaintiff claims that facts 70-74 are irrelevant insofar as she could have participated in the training remotely via the internet and Smith did not tell her that she was concerned about the computer class until nine days later.  (Doc. 19 at 189; Doc. 27 at 45).

73.     The computer training involved a new web-based application for completing Individual Education Plans (IEPs), which was required under the Individuals with Disabilities Education Act (IDEA). (*Id.* at 42). The administrators and curriculum specialists were going to be responsible for training and assisting building staff with the new program. (*Id.*)

74.     There was also training on IEP forms and training from the Ohio Department of Education support team that occurred on August 10. (Doc. 27 at 15).

77.     On July 30, 2009, Smith disapproved the request for vacation. (Doc. 27 at 38; Doc. 18, Ex. 9). The reason was that there was mandatory training critical to the functioning of the department. (*Id.*) Additionally, the days off were too close to the opening of the school year. (*Id.*)[29]

78.     On the day the vacation request was denied, Plaintiff attended a meeting with Jennifer Smith and Mary Conlon in which the mandatory training was discussed. (Doc. 27 at 15, Ex. 49). However, at no point did Plaintiff tell Smith that she would not be attending that training. (Doc. 18 at 192-193).[30]

79.     When Smith denied the vacation request, Plaintiff still did not tell anyone why her dissertation research was so important that she needed to miss mandatory professional development. (*Id.* at 222).[31]

80.     Plaintiff never asked anyone if there was any way she could take the training at another time or via another medium. (*Id.* at 190-191, 443). While she claims that the training could have been taken online, she took no steps to verify that fact before she left on her trip. (*Id.* at 190) Nor did she take the training prior to reporting back to work on August 12, 2009, the

---

[29] Plaintiff claims that these facts are irrelevant insofar as she could have participated in the training remotely via the internet and Smith did not tell her that she was concerned about the computer class until nine days later. (Doc. 19 at 189; Doc. 27 at 45).

[30] Plaintiff claims that these facts are irrelevant insofar as she protested the denial in her August 3, 2009 letter. (Doc. 18, Ex. 10).

[31] Plaintiff denies these facts insofar as a jury could conclude that her statement to Sweetnich, that she hoped to complete her dissertation and graduate within the next nine months, indicated the importance of her vacation request. (Doc. 18 at 39, 97, 199-200; Ex. 10).

same date building staff reported to work.[32]

81.     When asked how she planned to be able to teach building staff this new software and applications when she arrived to work on August 12, 2009, she said "I really didn't think about it." (*Id*. at 441).

82.     On August 3, 2009, rather than approaching Jennifer Smith to ask her to reconsider the request, Plaintiff sent an email that she copied to the HR Director and the Superintendent. (*Id*. at 37, Ex. 10).

83.     In that letter, she does not request a reconsideration of the denial of her vacation request. (*Id*.)[33]

84.     HR Director Sweetnich responded to Plaintiff's August 3rd email by asking about how earned vacation days align with her dissertation. (Doc. 18 at 39, Ex. 11).

85.     Sweetnich and Plaintiff exchanged emails about her expected graduation date.

86.     Plaintiff admits that Mr. Sweetnich never told her that he was reviewing the denial of her vacation request. (*Id*. at 204).[34]

87.     Plaintiff admits that Sweetnich never said she could go on vacation. (*Id*. at 202).

88.     At no time between the denial of the vacation request on July 30 and the conversation with Sweetnich on August 4, did Plaintiff have any oral conversation with her supervisors about her vacation request. (*Id*. at 203).

---

[32] With respect to facts 80-81, Plaintiff admits that she ascertained the viability or remote training when she returned. (Doc. 19 at 189). However, Plaintiff denies the facts insofar as her suspension made it impossible for her to make up the training.

[33] Plaintiff denies facts 82-83 insofar as a jury could consider her explanation that she needed to do research vital to her dissertation and protests about the impairment to her property interests and professional development to be a request for reconsideration. (Doc. 18, Ex. 10).

[34] Plaintiff denies facts 86-87 insofar as Stanic had asked Sweetnich to assume responsibility for the situation and Smith admits he took it. (Doc. 27 at 18, 69).

89.     Plaintiff assumed she was able to go on vacation because of the emails from Ed Sweetnich.  (*Id*.)[35]

90.     Sweetnich informed Plaintiff by email and phone that her assumptions with respect to her vacation request were unfounded.  (Doc. 18, Ex. 11 and 46).[36]

91.     Plaintiff did not present to work again until August 12, 2009.  (*Id*.)

92.     Board of Education policy specifically warns that this conduct would be considered "job abandonment" and could subject an employee to termination.  (Doc. 18, Ex. 62).[37]

93.     Sweetnich left a voicemail telling her she was considered AWOL and should return to work.  (*Id*., Ex. 13, 46).

94.     In the ten years that Ed Sweetnich had been the HR Director at DPS, no certificated employee had ever taken an unauthorized absence of five days and not been fired.  (Doc. 16, Ex. L).

95.     When Plaintiff reported back to work on August 12, she was placed on an immediate, paid administrative leave pending the filing of disciplinary charges.  (Doc. 18, Ex. 45).

96.     The following day, Plaintiff sent a letter to Dr. Stanic, blaming the suspension on Jennifer Smith "with the connivance of Sylvia Orr."  (*Id*., Ex. 46).

97.     On September 30, 2009, Sweetnich issued a Notice of Charges and Specifications, setting forth twelve charges of misconduct against Plaintiff.

---

[35]  Plaintiff admits this fact but notes that she had never had a vacation request denied. (Doc. 18 at 38-39; Doc. 19 at 315).

[36]  Plaintiff denies insofar as DPS has not established that Sweetnich's messages reached her, as she had begun the travel on the first vacation day she had requested.  (Doc. 19 at 233-235; Doc. 18 at 214).

[37]  Plaintiff denies facts 92-94 insofar as a jury does not have to agree that she was AWOL.

(*Id.*, Ex. 50).[38]

98.    Those charges would be identical to the final charges issued on May 10, 2010, with the exception of the issuer and signatory. (*Id.*, Ex. 13).[39]

99.    On October 6, 2009, Plaintiff was provided her *Loudermill* rights of notice and an opportunity to be heard when a hearing was scheduled with Ed Sweetnich, Jennifer Smith, and John Concannon (former legal counsel for the Board of Education). (*Id.* at 339). Plaintiff had legal counsel at this time. (*Id.*)

100.   On January 27, 2010, Plaintiff filed a complaint with the Equal Employment Opportunity Commission. (Doc. 18, Ex. 3).

101.   The EEOC issued a right to sue letter on this charge at Plaintiff's request on December 16, 2010. (*Id.*, Ex. 5).

102.   On May 20, 2010, the treasurer submitted the notice to Plaintiff that the Board of Education was planning to consider termination of her contract. (*Id.*, Ex. 13).[40]

103.   The charges and specifications set forth in that notice were the same as those set forth in the letter from Ed Sweetnich on September 30th. (Doc. 18, compare Ex. 13 and Ex. 50).

104.   Plaintiff then requested a hearing in front of the Board of Education in accordance with R.C. § 3319.16 and 3319.161. (*Id.*, Ex. 14).

105.   A hearing officer was selected. (*Id.*, Ex. 15).

106.   The Board of Education complied with all requirements for the termination of an administrator under O.R.C. §§ 3319.02 and 3319.16. (*Id.*, Ex. 13-16).

---

[38] Plaintiff admits that Sweetnich issued the specifications to her but denies the contents as pretext. (Doc. 31 at 23, 25-29).

[39] Plaintiff admits this fact but notes that Defendant is not entitled to an inference that the final termination decision was made before she filed her January 2010 EEOC charge.

[40] Plaintiff admits facts 102-103, but notes that Defendant is not entitled to an inference that the final termination decision was made before she filed her January 2010 EEOC charge.

107. Plaintiff filed a second claim with the EEOC on July 17, 2010, pointing to her termination from DPS as the adverse employment action while the statutory hearing process was still ongoing. (*Id*., Ex. 4).

108. On November 1, 2010, she elected not to move forward with the hearing in front of the Board of Education. (*Id*. at 372, Ex. 16).

109. On November 16, 2010, Superintendent Lori Ward recommended that the Board terminate Plaintiff's contracts. (*Id*., Ex. 69).[41]

110. Lori Ward is an African American female in her early 50's. (*Id*.; Doc. 25 at 6).

111. Lori Ward was also Deputy to the Superintendent, Dr. Stanic's right-hand person, at the time the charges against Plaintiff were issued. (Doc. 18, Ex. 68 at 1).[42]

112. The Board of Education voted unanimously to terminate Plaintiff's contracts in accordance with the Superintendent's recommendation. (Doc. 19 at 374, Ex. 69).[43]

113. After Plaintiff was terminated, her work was divided among the remaining staff. (Doc. 27 at 18). Jennifer Smith split the caseload among the buildings and everyone (including Smith) took additional buildings to cover Plaintiff's workload. (*Id*. at 19).

115. On May 12, 2011, the EEOC issued a "Dismissal and Notice of Rights" as to the plaintiff's charge of retaliatory discharge. (Doc. 18, Ex. 6).

116. DPS administrators have historically been both African American and female. (*See, e.g.*, current EEO-5 Form, showing 81 of 130 DPS administrators as being African American and 85 of 130 DPS administrators as being female).

---

[41] Plaintiff admits that Smith was a DPA employee who was the catalyst that started the termination process. (Doc. 21 at 14-15).

[42] Plaintiff admits this fact and notes that it makes it more likely that Ward had a retaliatory motive because she brought multiple discrimination complaints to Stanic. (Doc. 19 at 258, 267).

[43] Plaintiff admits this fact but notes that Smith was the DPS employee that was the catalyst who started the termination process. (Doc. 21 at 14, 52).

117. As the Ohio courts have already noted, Plaintiff's "own evidence shows that may African Americans served in leadership roles in the District, including in the position she sought." *Senu-Oke v. Bd. of Ed.*, App. Case No. CA20967, 2005-Ohio-5239, ¶ 37.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.  Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must

"produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007).  A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV.    ANALYSIS

### A.    Discrimination (Counts I and IV)

Plaintiff claims that she was discriminated against on the basis of race and gender in violation of Title VII and Ohio law.[44]

Plaintiff presents no direct evidence of unlawful discrimination, rather her claims of discrimination rely exclusively upon circumstantial evidence.  Therefore, this Court must analyze her claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This framework requires that the plaintiff first set forth a *prima facie* case of discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  Once a *prima facie* case has been shown, the plaintiff is

---

[44] "Federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Hampel v. Food Ingredients Specialties*, 729 N.E.2d 726, 731 (Ohio 2000).

entitled to a presumption that the defendant discriminated against him or her in violation of Title VII. *Id.* Under the second step of the analysis, the defendant must articulate a "legitimate, nondiscriminatory reason" for the complained of adverse treatment. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1980). If the defendant meets its burden under the second step of the analysis, the presumption of discrimination created by the *prima facie* case falls away, and the plaintiff must show that the defendant's legitimate nondiscriminatory reason was merely a pretext for unlawful discrimination. *Id.* at 253. Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, that the real reason for the adverse employment decision was unlawful discrimination. *Hicks*, 509 U.S. at 511.

To establish a *prima facie* case of employment discrimination based on race or gender, the plaintiff must present evidence demonstrating the following elements: (1) that she is a member of a protected class; (2) that she was qualified for her position; (3) that the defendant subjected her to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). The only contested element in the instant case is the fourth prong.

DPS claims that Plaintiff was not replaced because of a reorganization which reduced the number of associate directors. (Doc. 16, Ex. D). Plaintiff's duties were allegedly absorbed by the existing work force after her termination and she was not

replaced for two years.  (Doc. 27 at 18-20).  During those two years, Jennifer Smith and others absorbed Plaintiff's responsibilities.  (Doc. 27 at 18-20).  In fact, prior to her termination, there were only two associate directors, Plaintiff and Mary Conlon.  (*Id.* at 18).  The reorganization actually increased the number of associate directors from one to five and eliminated all the curriculum specialist positions.  (Doc. 29, Ex. D at 10).

Plaintiff fails to point to any Caucasian male treated more favorably than she – with the exception of George Schuereman, who was selected by an African American female nine years earlier to be the interim Director.  (Doc. 19 at 255, 426).  This claim was already rejected by another court on summary judgment.  Plaintiff's "own evidence shows that many African Americans served in leadership roles in the District, including in the position she sought."  *Senu-Oke v. Bd. of Ed.*, App. Case No. CA20967, 2005-Ohio-5239, at ¶ 37.  Moreover, the majority of DPS administrators have been both African American and female.  Eighty-one of the 130 DPS administrators are African American, and 85 of 130 DPS administrators are female.  (Doc. 16, Ex. M).

Nonetheless, Plaintiff argues that a jury could find that she was being treated differently in terms of her mileage requests and her vacation denial, and thus that she satisfied the fourth prong of her *prima facie* case of race and gender discrimination. (Doc. 31 at 21).

With respect to the mileage requests, Plaintiff sought reimbursement for mileage for round trips between school district buildings, where she was not actually completing a

round trip.[45] (Doc. 27 at 170-72). Ms. Smith asked Plaintiff to correct her form (Doc. 27 at 171), but Plaintiff refused to review and make corrections on the mileage form (Doc. 18 at 77).[46] Plaintiff did not deny that she submitted mileage in this manner, and instead reported that it had been the past practice to report trips between buildings as round trips. (*Id*; Doc. 27 at 171). However, Plaintiff admits that she does not know anyone else who submitted the mileage forms in this manner. (Doc. 18 at 77-79). Moreover, there is no evidence that Ms. Smith was aware of another DPS employee who submitted false mileage reports but did nothing about it.

With respect to the vacation requests, Plaintiff claims that a jury could infer the denial of her vacation request was racially motivated. However, Plaintiff could not explain why Ms. Smith approved the seven other vacation requests Plaintiff made in 2009, if the denial of the July 21 request was somehow racially motivated. (Doc. 19 at 301, Ex. 67). There is also no evidence of a comparable administrator who requested leave for the critical weeks leading up to the school year. No other administrator had ever asked her for that time of the year off. (Doc. 27 at 62). Additionally, in the ten years Mr. Sweetnich had been the HR Director, no certificated employee had ever been AWOL for

---

[45] The reason this issue came up was that the finance office was complaining about managing mileage costs, which prompted Ms. Smith to monitor those costs more closely. (Doc. 23 at 25).

[46] In light of Plaintiff's refusal to revise her form, Ms. Smith asked Plaintiff for an affirmative and written response stating that she understood the Board policy on the issue. (Doc. 18, Ex. 19). However, Plaintiff did not send any written response, even when Ms. Smith asked her to do so more than once. (*Id*; Doc. 27 at 176).

5 days without being terminated.  (Doc. 16, Ex. L).

Even if Ms. Smith's denial of Plaintiff's vacation request was racially motivated, Ms. Smith did not terminate Plaintiff.  Ms. Smith could not legally recommend Plaintiff's termination.  *See* Ohio Rev. Code § 3319.16.[47]  There are mandatory steps between the immediate supervisor gathering records to initiate termination proceedings and the eventual termination of a school administrator.  *Id.*  Ms. Smith did not draft the termination specifications, she did not testify in front of a hearing officer (because Plaintiff waived that right), and she did not speak with the Board of Education about the termination.  Plaintiff's burden is to show the Board of Education discriminated against her – not Jennifer Smith.[48]

Accordingly, Plaintiff fails to state a *prima facie* claim for race and gender discrimination.

## B.    Retaliation (Counts  III and VI)

In order to establish a claim for retaliation, a Plaintiff must prove that: (1) she

---

[47]  "[T]he board by majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract."  *Id.*

[48]  Plaintiff also argues that Ms. Smith did not afford her the opportunity to recommend strategies for the Special Education Department and excluded her from decision making for the district.  (Doc. 18 at 60, 70).  Again, this allegation, even if valid, is irrelevant because the Board of Education terminated Plaintiff's employment, not Ms. Smith.  Additionally, there is no evidence in the record that would demonstrate that any alleged pay inequities had to do with race or gender.  There is nothing in the record to contradict Superintendent Stanic's explanation that the school district was and had been under severe financial constraints and he could not arbitrarily recommend that a single administrator get a raise.  In fact, Plaintiff admitted that she had no knowledge about the salaries of other employees of DPS.  (Doc. 19 at 290).

engaged in protected activity; (2) her exercise of her civil rights was known to the defendant; (3) she was the subject of adverse employment action; and (4) that a causal link existed between the protected activity and the adverse action. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Defendant claims that Plaintiff cannot establish the fourth prong of the *prima facie* case.

### 1. *Causal connection*

To establish the causal connection, Plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had she not engaged in protected activity. *EEOC v. Avery Dennison Corp.*, 104 F.3d, 858, 861 (6th Cir. 1997).

Plaintiff claims that she has the requisite evidence to establish a jury question about a causal link. Specifically, she maintains that there were escalating complaints by her to or about Jennifer Smith with escalating consequences from Ms. Smith. Plaintiff alleges that the actions of Ms. Smith were retaliatory and even attributes the decision to recommend termination to Ms. Smith. However, there is no evidence that Ms. Smith was ever aware of a single "protected activity" by Plaintiff.

In order for a complaint to form the basis of a retaliation claim, the employer must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the employment discrimination laws. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2nd Cir. 1998). In *Balding-*

*Margolis*, the Sixth Circuit concluded that the plaintiff had not engaged in protected conduct where, although she made several complaints to management concerning general work-related issues, her complaints contained no indication she "was objecting to discriminatory conduct against her based on her membership in a protected class." *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35, 45 (6th Cir. 2009).

Plaintiff points to four "complaints" she made between June 2008 and August 2009 that she contends Jennifer Smith responded to in a retaliatory manner:

1.      In 2007, Jennifer Smith learned that Plaintiff had filed a suit against the district.

2.      In June 2008, Plaintiff states on her evaluation form her belief that Smith is motivated by "prejudice, bias, or discrimination."

3.      In January 2009, Plaintiff complained about the decision to rehire Sylvia Orr, supposedly as an attempt to create a hostile environment for Plaintiff.

4.      In August 2009, Plaintiff claims the decision to deny her vacation request was discriminatory.

(Doc. 31 at 16-17).

Jennifer Smith did testify that sometime in 2007 she learned that Plaintiff had filed a lawsuit against the District. (Doc. 27 at 10). However, she explained that she had no background, information, history, or details about the prior lawsuit. (*Id.* at 11). All she knew was that there had been a lawsuit and Plaintiff had been unsuccessful. (*Id.* at 10-11). There is no evidence that Ms. Smith knew whether the suit had anything to do with race, age, or gender discrimination.

With respect to the June 2008 evaluation "complaint," Plaintiff wrote that she should have received the highest performance rankings based upon the extent of her academic and professional development, "unless DPS evaluator is motivated by bias, discrimination and prejudice." (Doc. 18, Ex. 8). It appears Plaintiff was suggesting that Ms. Smith was prejudiced against her because, unlike other special education administrators, Plaintiff had "successfully embarked upon on-going academic and professional development at an ODE accredited graduate university or similarly accredited university program." (*Id*.) However, nothing in this letter gives any indication that the possible "bias, discrimination and prejudice" had anything to do with race or gender discrimination. In order for a complaint to form the basis of a retaliation claim, the employer must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the employment discrimination laws. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2nd Cir. 1998).

The allegation of "hostile work environment" that Plaintiff claims she made in a letter to Dr. Stanic in January 2009 does not address any type of behavior protected by the law. (Doc. 31 at 7). In fact, the "complaint" Plaintiff is referring to is actually a letter she sent to Ms. Smith on January 17, 2009, not a complaint to Dr. Stanic. (Doc. 18, Ex. 22 and 24). Specifically, Plaintiff noted, "I am writing to state for the record that, I hope Ms. Sylvia Orr's rehire albeit on a part-time basis, is not intended to foster the culture of

cronyism that has impaired effective professionalism and efficient service delivery obligation of the Special Education Department." (*Id.*, Ex. 24). She goes on to complain that Ms. Orr was involved in this hiring of "comparatively lower credentialed" directors, including Ms. Smith. (*Id.*) Then, Plaintiff repeats her concerns that the rehire appears to be an effort to "perpetuate cronyism." (*Id.*) Plaintiff does not state any concern about "hostile work environment." She does state that "contrived *** with the intent to make special education administration at DPS unduly cumbersome in order to create jobs for retired employees." (*Id.*) Nothing in this letter suggests that the decision to re-hire Sylvia Orr had anything to do with retaliation against her personally. Moreover, the fact that Plaintiff was complaining about the hiring of another African American female undermines any inference that the complaint was about racial or gender discrimination.

Finally, in the letter Plaintiff wrote to Jennifer Smith in August 2009, after her vacation request was denied, Plaintiff said "I would also like to inform you that your actions towards me have shown that you have an inclination toward bias and prejudice. You have shown personal animosity towards me and disparage the fact that I have the most seniority among DPS special education administrators." (Doc. 16 at 37, Ex. 10). It appears Plaintiff is accusing Smith of being jealous of her position and accomplishments.

However, when asked to explain the allegations, Plaintiff could not point to a single instance of disparagement by Ms. Smith. (*Id.* at 41-45). Plaintiff stated "[Smith] did not value what I believed that I was able to bring to the African American students in

the Dayton Public Schools." (*Id.* at 42).

> Q. What specifically about you do you believe that Ms. Smith disliked?
> A. I don't know.
> Q. Do you believe it's because you're African American?
> A. I don't know.
> Q. Do you have any evidence or information that would make you believe that she disliked you because you're African American?
> A. I don't know.
> Q. At any time have you ever heard Ms. Smith say anything remotely racist?
> A. I don't recall.

(*Id.* at 45).

Accordingly, the Court finds that Plaintiff fails to allege or proffer any evidence of a protected activity. Moreover, even if Plaintiff did allege or proffer evidence of a protected activity, it was the Board of Education that made the ultimate decision to terminate Plaintiff's contract, not Jennifer Smith, Ed Sweetnich, or Dr. Stanic. Therefore, Plaintiff fails to establish that a causal link existed between the protected activity and the adverse action.[49]

## 2. *Legitimate business reasons*

Even if Plaintiff were able to state a *prima facie* case, the Board of Education provided a twelve-count notice of charges and specifications that sets forth several legitimate, non-discriminatory reasons for the decision to terminate Plaintiff.

---

[49] The Court declines to address Defendant's claim that Plaintiff failed to exhaust her administrative remedies. Plaintiff has failed to establish a *prima facie* claim of race and gender discrimination and retaliation, and, therefore, the Court need not address Defendant's alternative argument.

Specifically, Plaintiff went on vacation despite having had her vacation disapproved[50] (Doc. 18, Ex. 13), and admitted that she did not produce evidence to support her evaluation, despite having been told to do so multiple times (Doc. 18, Ex. 13). These are legitimate reasons for termination.[51] Moreover, Plaintiff had the opportunity to present evidence to a hearing officer and the Board of Education to contradict these specifications, but declined to do so.

### 3.    Pretext

Plaintiff has failed to offer any evidence that the reasons set forth by Defendants were false or that the real reason for her termination was discrimination or retaliation. To prove pretext, plaintiff must show by a preponderance of the evidence either that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the employer's action; or (3) was insufficient to motivate the action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Ultimately, "a reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination

---

[50] Courts have found job abandonment to be a legitimate business reason for termination. *See, e.g., Antonio v. Sygma Network*, 458 F.3d 1177, 1184 (10th Cir. 2006) (no evidence that charge of job abandonment was pretext for retaliation); *Egbarin v. Am. Express Co.*, 451 F. Supp. 2d 413, 423 (D. Conn. 2006) (job abandonment is a legitimate, non-discriminatory basis for termination of plaintiff who took an unapproved ten-day absence).

[51] Additional reasons for termination included: (1) a 2009 performance evaluation that noted "needs improvement"; (2) failure to adequately instruct Fairview Special Education teachers regarding the process to complete IEPs (Doc. 18, Ex. 13; Doc. 27 at 93-94); (3) failure to be present at a DPS school where she was assigned as a summer school administrator (Doc. 18, Ex. 13); and (4) a statement to Smith and Lowry that she "did not have to sit and listen" at their February 26, 2009 meeting.

was the real reason." *Hicks*, 509 U.S. at 515. Conclusory allegations of pretext are wholly insufficient to withstand a motion for summary judgment once the employer has presented a legitimate, non-discriminatory reason for its employment decision. *Hopson v. Daimlerchrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002). A plaintiff cannot show pretext by merely disputing the allegations or questioning the reason given. *Braithwaite*, 258 F.3d at 493. Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494.

When asked which of the charges and specifications she believed to be false, Plaintiff responded in a conclusory fashion that all the specifications were false. (Doc. 19 at 445-448). When specifically asked which facts were false, she simply asserted that "the 12 specifications came about because I filed an EEOC complaint against the Dayton Board of Education and it's contrived with regards to a form of retaliation against me." (*Id.* at 447). This explanation is unpersuasive because the charges were written and provided to her before she filed her EEOC charge. Accordingly, and for the reasons explained *supra*, Plaintiff has failed to evidence pretext. Therefore, Plaintiff's discrimination and retaliation claims fail as a matter of law.

### C. First Amendment (Count VII)

Plaintiff also asserts a Section 1983 claim based on the allegation that Defendants retaliated against her for accessing the courts in violation of the First Amendment. (Doc.

1 at ¶ 63). Specifically, Plaintiff argues that the Board received notification that she hired

an attorney in September 2009, before her termination.

The right of access to the courts is a fundamental right protected by the

Constitution. *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997). This

right encompasses matters of public concern "fairly considered as relating to any matter

of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138,

146 (1983). A constitutional retaliation claim under Section 1983 requires the plaintiff to

prove: (1) that there was constitutionally-protected conduct; (2) an adverse action by

defendant sufficient to deter a person of ordinary firmness from continuing to engage in

that conduct; and (3) a causal connection between the first and second elements, that is,

the adverse action was motivated at least in part by plaintiff's protected conduct.

*Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010).

First, any protected activity by Plaintiff was as an employee upon matters of

personal interest, not as a citizen upon matters of public concern. *Connick v. Myers,* 461

U.S. 138, 147 (1983). In fact, Plaintiff was very blunt when she said, "I'm not concerned

about going beyond just me. I'm concerned about Dr. Senu-Oke." (Doc. 19 at 452).

However, this Court need not actually determine whether Plaintiff can meet her

burden to show a violation of the First Amendment under the "public concern" analysis,

because she cannot show an unconstitutional "policy or custom" by the Dayton Board of

Education under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978).

The United States Supreme Court has concluded that a governmental entity may not be held liable under Section 1983 based on a theory of respondeat superior. *Id.* at 694. A government is responsible under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." (*Id.*) To hold the Board liable under Section 1983, the plaintiff must: (1) identify the government policy or custom; (2) connect the policy to the government; and (3) show that the injury was incurred due to the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005). A "custom" must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691. Plaintiff has no evidence that the Board of Education had a custom or policy of terminating employment in retaliation for the exercise of the right to access to the courts under the First Amendment.[52]

In fact, Plaintiff admitted that she does not have evidence that any other employee was treated unlawfully based upon constitutionally protected behavior. (Doc. 19 at 452). Therefore, there is no evidence of a pattern of discrimination by any of the school personnel involved in this matter. *Swanson v. Livingston Cnty.*, 121 Fed. Appx. 80, 85

---

[52] Plaintiff contends that her evidence of a "pattern and practice" is the fact that the alleged discrimination occurred over more than a decade. (Doc. 31 at 30). Again, the prior lawsuit actually resulted in a finding that the Board of Education had not discriminated against her. Moreover, there is no evidence that the Board had a custom or policy of terminating employment in retaliation for the exercise of the right to access the courts under the First Amendment.

(6th Cir. 2005) (county entitled to summary judgment based on failure to prove custom or policy where plaintiff failed to identify alleged harassment against any individual but herself).

Accordingly, even considering the evidence in the light most favorable to the non moving party, Plaintiff fails to allege a *prima facie* case for violation of her First Amendment rights.

## V.    CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment (Doc. 16) is **GRANTED,** the Clerk shall enter judgment accordingly, the status conference of 8/3/12 is vacated, and this case is to be **CLOSED**.

**IT IS SO ORDERED.**

Date:  _7/30/12_____              _____*s/ Timothy S. Black*_____
                                            Timothy S. Black
                                            United States District Judge